IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VINCENT FERST | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KEVIN KAUFFMAN, et al.[1] | : | NO.  13-6394 |

## REPORT AND RECOMMENDATION

ELIZABETH T. HEY, U.S.M.J.                    December 22, 2014

This is a pro se petition for writ of habeas corpus filed pursuant to 28 U.S.C.

§ 2254, by Vincent Ferst ("Petitioner"), who is currently incarcerated at SCI-Smithfield

in Smithfield, Pennsylvania.  For the reasons that follow, I recommend that the petition

be denied.

## I.    FACTS AND PROCEDURAL HISTORY

On March 17, 2003, after a ten-day jury trial before the Honorable M. Teresa

Sarmina of the Philadelphia Court of Common Pleas, the jury convicted Petitioner of six

counts of robbery, five counts of criminal conspiracy, two counts of aggravated assault,

one count of possessing an instrument of crime, one count of attempted robbery of a

motor vehicle, and one count of robbery of a motor vehicle, all in connection with a

violent robbery spree that took place between February 10 and 14, 2002.  See

---

[1]At the time Ferst filed his habeas petition Jon Fisher was the superintendent of the State Correctional Institution at Smithfield ("SCI-Smithfield"), and he properly named Mr. Fisher as the respondent.  However, since that time, Kevin Kauffman has been named superintendent of the facility.  Therefore, I have replaced Mr. Kauffman as the respondent in this case.  See Rule 2(a) of the Rules Governing Section 2254 Cases (requiring the state officer with current custody to be named as the respondent).

Commonwealth v. Ferst, Nos. 0553-0556, 0546-0547, 2006 WL 5429325, Opinion

(Phila. C.C.P. June 26, 2006) (attached to response at Exh. A) ("Trial Ct. Op.").  On

direct appeal, the Pennsylvania Superior Court quoted Judge Sarmina's lengthy factual

recitation as follows:

> On February 10, 2002, at approximately 9:30 p.m., Robert
> Rosenberger was walking home from the local Dunkin'
> Donuts, approximately four to five blocks from his home.  On
> his way home, he cut through a park near Roxborough High
> School.  Mr. Rosenberger was attacked from behind by four
> white males in their early to mid twenties.  Mr. Rosenberger
> was struck several times on the back left side of his head by a
> baseball bat which he believed to be metal.  Additionally, Mr.
> Rosenberger was stabbed on his shoulder, legs, and all over
> his back.  He was also kicked repeatedly.  As a result of his
> injuries, Mr. Rosenberger was transported to the hospital by
> ambulance and was admitted from February 10, 2002 through
> March 28, 2002.  During his hospitalization, Mr. Rosenberger
> had to undergo a tracheotomy.
>
> At around 8:00 p.m. on February 11, 2002, Diane Folger was
> standing at a bus stop on First Avenue in King of Prussia.
> She was waiting for the bus with Maryanne Talese, a co-
> worker.  Four white males approached the women.  One of
> the men was holding a silver baseball bat, that Ms. Talese
> believed to be metal or aluminum.  Another said, "Ladies,
> sorry to do this but we want your stuff."  One of the men took
> Ms. Talese's handbag and her "carry bag," and punched her
> several times in the eye with a closed fist.  Ms. Talese was
> later taken to the hospital and treated for a black eye, bruises,
> and abrasions.  Ms. Folger would not release her handbag.
> As a result, she was punched in the face, pushed to the
> ground, and hit repeatedly.  Later, Ms. Folger went to the
> hospital and was examined.  She had bruises on her shoulder,
> arms, and right hip.
>
> On February 14, 2002, at approximately 9:40 p.m., after
> leaving work at Zales Jewelers at the Plymouth Meeting Mall,
> Delores Prince and Dorothy DiGiacomo were approached by
> two men in the mall parking lot.  The two men were later

identified by Ms. Prince as [Appellant and his co-defendant, Michael Grimaldi]. Appellant pushed Ms. Prince up against her car and demanded her handbag. While appellant struggled with Ms. Prince, Grimaldi struggled with Ms. DiGiacomo, during which Grimaldi brandished a gun, and pointed it at Ms. DiGiacomo. Grimaldi began kicking Ms. DiGiacomo and hitting her in the head with the gun. Additionally, Ms. DiGiacomo was spun around, pulled by her hair, knocked on the ground, and kicked in the face. After this simultaneous attack, appellant ran toward a waiting car, to which he was followed thereafter by Grimaldi. The two entered a dark colored car. Ms. DiGiacomo suffered from several bruises as well as swelling on her face. Ms. Prince sustained bruises to her back, leg, and arm.

At approximately 10:15 p.m. on February 14, Jacqueline Harmer had just finished a transaction at an ATM located in the Andorra Shopping Center. While unlocking her car door, Ms. Harmer was approached by three men. Two of the three men were later identified as Grimaldi and appellant. The men demanded money from Ms. Harmer, at which time appellant pointed a gun at her. Ms. Harmer indicated that she did not have any money. The men then demanded her car [a black 2000 Dodge Stratus], and took it.

The same night, at around 11:50 p.m., Dawn Wynne was walking down Ridge Avenue in Philadelphia to a bar to meet a friend. Ms. Wynne noticed a car pass by her driving at a slow pace. The car slowed down and turned the corner in front of Ms. Wynne. Ms. Wynne crossed the street as a precaution, and then turned onto Fountain Street and continued to walk down Fountain Street. As she was walking down Fountain Street, the same car passed her, and pulled over approximately four car lengths in front of her. Three men exited the car; one remained in the driver's seat. The three men started walking toward her, but they were crossing to the opposite side of the street. Ms. Wynne continued walking, and then heard a noise behind her. She went to turn around when one of the men asked her what time it was. Ms. Wynne told him that she did not know. She heard the men rushing up behind her, so she ran. Ms. Wynne ran up onto a porch and began banging on the door. She turned around to see where the men were. Two of the men had gotten back

3

into the car; the other continued to walk straight down the hill past the car. No one responded to her at the first door, and when Ms. Wynne saw the vehicle's brake lights go on, she proceeded to the next door, where she was let in to call the police.

[Officer Jeanne Austin responded to Ms. Wynne's report, and Ms. Wynne described the incident to Officer Austin and further provided a description of the suspect vehicle as a black Dodge Stratus with the license plate number DXD-6012.]

In the early hours of February 15, 2002, at approximately 12:05 a.m., Jennifer Kwiecinski had left work in the Manayunk section of Philadelphia. She had just dropped off a friend, and was parking her car on Smick Street. Ms. Kwiecinski exited her car and began to cross the street when she realized she had left her house keys in her car. While she was unlocking her car door, a black car drove by and honked at her. The car was traveling down Smick Street from Fountain Street. Ms. Kwiecinski retrieved her house keys, locked her car door, and began crossing the street toward the sidewalk. When she got to the sidewalk, she saw several individuals standing in the street in front of her. Ms. Kwiecinski turned left and began walking toward Fountain Street. Moments later, Ms. Kwiecinski was jumped from behind and hit in the face. She was also hit numerous times in the shoulder and back. Towards the end of this attack, one of the males finally demanded Ms. Kwiecinski's car keys. Ms. Kwiecinski threw her keys to the ground, and the men picked up her keys and ran. Throughout the attack, Ms. Kwiecinski was screaming for help. Her neighbors called 911. At this point her back felt cold and wet. Ms. Kwiecinski was transported to the hospital by ambulance, and placed on oxygen for one and one-half days. During the attack, she had been stabbed ten times in the back and once in the forearm. Ms. Kwiecinski had two punctured lungs, for which tubes were inserted into her chest cavity.

[Ms. Kwiecinski's neighbor, who had responded to Ms. Kwiecinski's calls for help, reported to police that he saw a black Dodge Stratus, with four people inside, leave the scene.]

Commonwealth v. Ferst, 1577 EDA 2006, Memorandum at 1-4 (Pa. Super. Aug. 10, 2007) (attached to response at Exh. B) ("Super. Ct.–Direct") (quoting Trial Ct. Op. at 2-6) (record citations and footnotes omitted, bracketed portions added by Superior Court).

The Superior Court continued the factual recitation as follows:

> Appellant was apprehended in the early morning hours of February 15, 2002, when Philadelphia Police Officer George Kieffer, who had received Officer Austin's broadcast of the description of a suspect vehicle involved in the assault upon Ms. Wynne, observed the black Dodge Stratus bearing the license plate number DXD-6012.  A high-speed pursuit ensued, during which Officer Kiefer observed appellant, who was driving the Dodge, give the officer "the finger." [Appellant's] co-defendant, Michael Grimaldi, was present in the vehicle, as were co-conspirators, Richard Bonneau, and Joseph Davis.  The pursuit ended when appellant crashed the car and attempted to flee.  Officer Austin, who had responded to the police report of a chase involving the suspect vehicle, found appellant hiding in weeds near the area of the crash, and took him into custody.  Appellant, in a statement given to Philadelphia police on February 17, 2002, indicated that he had been involved in the attack of Ms. Prince and Ms. DiGiacomo at the Plymouth Meeting Mall in Montgomery County, and that he was aware that a woman had been stabbed in a separate incident but that he did not have a knife.

Super. Ct.–Direct at 4-5.

Judge Sarmina denied Petitioner's pretrial suppression motions[2] and he was tried before a jury together with co-defendant Michael Grimaldi.[3]  As previously noted,

---

[2]Prior to trial, Petitioner moved to suppress self-incriminating statements he gave to the police, the identification testimony of Ms. DiGiacomo and Mr. Rosenberger, and the in-court identification made by Ms. Prince during the preliminary hearing.  All of the motions were denied.  N.T. 03/07/03 at 56-58, 163, 245-47.

Petitioner was convicted of multiple counts of robbery, criminal conspiracy, and

aggravated assault, as well as related charges.[4]  On May 29, 2003, Judge Sarmina

sentenced Petitioner to an aggregate sentence of 44 ½ to 94 years' imprisonment.[5]  See

N.T. 05/29/03 at 97-101.  Petitioner raised post-sentence motions, which were denied.

Petitioner did not file a timely direct appeal, but was granted leave to appeal nunc

pro tunc.[6]  In his direct appeal, Petitioner raised one issue, namely, whether the trial court

erred by granting the Commonwealth's motion to consolidate all of the charges against

him because "of the danger of confusion on the part of the jurors and because the

offenses charged were not based on the same act or transaction."  Super. Ct.–Direct at 7.

By memorandum opinion dated August 10, 2007, the Superior Court affirmed

Petitioner's judgment of sentence.  Id. at 1, 11.  Petitioner filed a petition for allowance of

---

[3]The other individuals charged in connection with the crime spree, Joseph Davis and Richard Bonneau, entered guilty pleas and did not proceed to trial.

[4]Petitioner was found guilty of the robberies of Ms. Folger, Ms. Talese, Ms. Prince, Ms. DiGiacomo, Ms. Harmer, and Ms. Kwiecinski; guilty of criminal conspiracy with respect to the incidents involving Ms. Folger and Ms. Talese, Ms. Prince and Ms. DiGiacomo, Ms. Harmer, Ms. Wynne, and Ms. Kwiecinski; guilty of aggravated assault upon Ms. Kwiecinski and Ms. DiGiacomo; and guilty of possessing an instrument of crime and robbery of a motor vehicle in the attack upon Ms. Harmer, and of attempted robbery of a motor vehicle resulting from the attack upon Ms. Kwiecinski.  See Super Ct.-Direct at 6 n.2-n.5.  Petitioner was acquitted of all charges arising from the attack upon Mr. Rosenberger.  Id. n.5.

[5]As will be explained, Petitioner's sentence was later reduced.

[6]Petitioner's trial counsel filed his original request for leave to appeal nunc pro tunc, which the trial court granted, but on January 7, 2005, the Superior Court dismissed the appeal for counsel's failure to file an appellate brief.  See Super. Ct.-Direct at 6.  On January 28, 2005, Petitioner filed a pro se request for leave to appeal nunc pro tunc, which the trial court granted after appointment of new counsel.  Id. at 6-7.

appeal with the Pennsylvania Supreme Court, which was denied on December 20, 2007.

Commonwealth v. Ferst, No. 502 EAL 2007 (Pa. Dec. 20, 2007) (table).

On December 18, 2008, Petitioner filed a pro se petition pursuant to

Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. C.S.A. §§ 9541-9551,

followed by an amended PCRA petition filed by appointed counsel on January 6, 2011.[7]

On November 18, 2011, the PCRA court determined that there was insufficient evidence

to identify Petitioner as one of the perpetrators of the February 11, 2002 incidents

involving Ms. Folger and Ms. Talese, thus vacating those sentences and reducing his

sentence to 40 ½ to 86 years' imprisonment, and otherwise dismissed the petition.[8]  See

Commonwealth v. Ferst, 184 EDA 2012, Memorandum at 5 n.4 (Pa. Super. Dec. 21,

2012) (attached to response at Exh. C) ("Super. Ct.-PCRA").

Petitioner appealed to the Superior Court, arguing that trial counsel was ineffective

for (1) being absent during a portion of co-defendant Grimaldi's suppression hearing,

(2) failing to request a severance of Petitioner's trial from that of Grimaldi, (3) failing to

challenge the sufficiency of the evidence on certain counts, (4) failing to object to the

trial court's consideration of impermissible factors in sentencing, and (5) failing to

challenge the imposition of a mandatory sentence for armed robbery when Petitioner did

---

[7]The PCRA court appointed an attorney for Petitioner, but the attorney filed a no-merit letter pursuant to Commonwealth v. Finley, 550 A.2d 213 (Pa. Super. 1988), and a petition to withdraw.  After the court granted counsel permission to withdraw, a new attorney entered an appearance on Petitioner's behalf and filed the amended PCRA petition.

[8]The Commonwealth did not appeal the PCRA court's determination or the subsequently reduced sentence.  See  Super. Ct.-PCRA at 5 n.4.

not personally possess the gun and was not the gunman in the Prince/DiGiacomo incident. Super. Ct.-PCRA at 6. By memorandum opinion dated December 21, 2012, the Superior Court rejected Petitioner's first four claims but granted relief on the fifth claim pursuant to Commonwealth v. Dickson, 918 A.2d 95 (Pa. 2007) (mandatory sentencing enhancement does not apply to unarmed co-conspirators), which had been decided while Petitioner's case was pending on appeal. Id. at 1, 18-19. Petitioner was resentenced in March 2013. See CP-51-CR-0605532-2002, Docket (Phila. C.C.P.)( "Docket"). Neither the docket nor the parties identify what sentence was imposed on remand.[9]

On October 18, 2013,[10] Petitioner filed this pro se petition identifying the following six grounds for relief:

> Ground One:  Ineffectiveness of trial counsel for being absent during part of co-defendant Grimaldi's pretrial proceedings;

---

[9] The state court docket is also unclear regarding the precise date of Petitioner's re-sentencing. Following remand for re-sentencing, the matter was continued several times, including March 7, 2013 and March 18, 2013. See Docket. The trial court listed the matter for the last time on March 21, 2013, at which time the front page of the docket indicates that the matter was "Completed," while the Docket's penultimate page states that the case was listed that day "in Error." Id. The parties shed no further light on the timing of the re-sentencing, as both merely state that "the Philadelphia Court of Common Pleas imposed a new sentence in March of 2013." Doc. 9 at 5; Doc. 13 at 4. As will be explained at the start of the Discussion section, the exact date of re-sentencing does not affect the timeliness of the petition.

[10] Although Petitioner's petition was docketed on October 31, 2013, the federal court employs the "mailbox rule," deeming the petition filed when given to prison authorities for mailing. Burns v. Morton, 134 F.3d 109, 113 (3d Cir. 1998) (citing Houston v. Lack, 487 U.S. 266 (1988)). Petitioner signed his petition on October 18, 2013, see Doc. 1 at 18 (ECF pagination), and I will assume that he gave the petition to prison authorities for mailing on that date.

Ground Two: Ineffectiveness of trial counsel for failing to request a motion to sever Petitioner's trial from that of Grimaldi;

Ground Three: Ineffectiveness of trial counsel for failing to challenge the sufficiency of the evidence as to the aggravated assault in the Prince and DiGiacomo robbery, and the convictions for three counts of criminal conspiracy arising from a single, continuous conspiracy;

Ground Four: Ineffectiveness of trial counsel for failing to challenge the trial court's consideration of impermissible factors during sentencing;

Ground Five:  Ineffectiveness of prior counsel for failing to challenge the trial court's imposition of an unlawful mandatory sentence; and

Ground Six: The trial court violated his due process rights by consolidating the charges against him at trial.

See Doc. 1 at 4-5, 7-14.[11]  The District Attorney filed a response on March 14, 2014, arguing that Petitioner is not entitled to relief, and Petitioner filed a traverse in support of his petition on May 15, 2014.  See Docs. 9 & 13.  The matter is ripe for review.

## II.    LEGAL STANDARD FOR MERITS REVIEW

The federal courts' habeas review is limited in nature.  The Antiterrorism and Effective Death Penalty Act ("AEDPA"), which became effective on April 24, 1996, amended the standards for reviewing state court judgments in federal habeas petitions filed under 28 U.S.C. § 2254.  Werts v. Vaughn, 228 F.3d 178, 195 (3d Cir. 2000). AEDPA increased the deference federal courts must give to the factual findings and legal determinations of the state courts.  Id. at 196 (citing Dickerson v. Vaughn, 90 F.3d 87, 90

---

[11]All citations are to the court's ECF pagination.

(3d Cir. 1996)).  Pursuant to 28 U.S.C. § 2254(d), as amended by AEDPA, a petition for habeas corpus may only be granted if (1) the state court's adjudication of the claim "resulted in a decision contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or if (2) the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  Factual issues determined by a state court are presumed to be correct, rebuttable only by clear and convincing evidence.  Werts, 228 F.3d at 196 (citing 28 U.S.C. § 2254(e)(1)).

The Supreme Court has explained that "[u]nder the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  With respect to "the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  The "unreasonable application" inquiry requires the habeas court to "ask whether the state court's application of clearly established federal law was objectively unreasonable."  Id. at 409.  As the Third Circuit has noted, "an unreasonable application of federal law is different from an incorrect application of such law and a federal habeas court may not grant relief unless that court determines that a state court's incorrect or erroneous

10

application of clearly established federal law was also unreasonable." Werts, 228 F.3d at

196 (citing Williams, 529 U.S. at 411).

## III.   DISCUSSION[12]

### A.   Grounds One through Five: Ineffective Assistance of Counsel

Petitioner's first five Grounds for Relief involve ineffective assistance of counsel

claims exhausted on PCRA appeal, and as to each the District Attorney argues that that

Petitioner is not entitled to relief.  Claims of ineffective assistance of counsel are

governed by Strickland v. Washington, 466 U.S. 668 (1984).  In Strickland, the United

States Supreme Court set forth the standard for a petitioner seeking habeas relief on the

grounds of ineffective assistance of counsel.  First, the defendant must show that

counsel's performance was deficient.  This requires showing that counsel made errors so

serious that counsel was not functioning as "counsel" guaranteed the defendant by the

Sixth Amendment.  Second, the defendant must show that the deficient performance

prejudiced the defense.  This requires showing that counsel's errors were so serious as to

deprive the defendant of a fair trial, a trial whose result is reliable.  Id. at 687.  In

---

[12]Petitioner's habeas petition is timely.  For purposes of the one-year AEDPA
limitations period, Petitioner's conviction became final in April 2013, thirty days after the
trial court re-sentenced Petitioner in March 2013.  See Burton v. Stewart, 549 U.S. 147,
156-57 (2007) (where state appellate courts remand for resentencing, the limitations
period does not begin until both the conviction and resentencing claims are final);
Ferreira v. Sec'y, Dep't of Corrs., 494 F.3d 1286, 1292-93 (6th Cir. 2007) (applying
Burton when resentencing resulted from state post-conviction proceeding and federal
petition challenged original conviction);  Cochran v. Phelps, 600 F. Supp.2d 603, 607
(D. Del. 2009) ("In cases involving re-sentencings, the petitioner's judgment becomes
final, and [the federal habeas] limitations period begins to run, from the date on which
direct review of a re-sentencing . . . expires.").  Therefore, the limitations period
commenced in April 2013, and the habeas petition he filed on October 18, 2013, is
timely.

determining prejudice, the question is whether there is a reasonable probability that, the result of the proceeding would have been different.  Id. at 694.  The Third Circuit has held that counsel will not be considered ineffective for failing to pursue a meritless argument.  Parrish v. Fulcomer, 150 F.3d 326, 328 (3d Cir. 1998).

### 1.  Ground One: Trial counsel ineffectiveness for being absent for part of his co-defendant's proceedings

Petitioner first argues that trial counsel was ineffective for having been absent for a part of co-defendant Grimaldi's pretrial proceedings.  See Doc. 1 at 7 (Ground One); Doc. 13 at 4-8.  Respondents counter that the claim is meritless.  See Doc. 9 at 10-14.

In considering this claim on PCRA appeal, the Superior Court stated:

> [Petitioner] asserts that the court erred in concluding that his trial counsel, Lawrence Narcisi, Esquire, was not ineffective despite his absences from a February 7, 2003 hearing on a motion to quash related to charges against co-defendant Grimaldi and a March 6, 2003 hearing to suppress co-defendant Grimaldi's statement to police.  [Petitioner's] position is based on fundamental principles regarding representation.  "An accused's right to be represented by counsel is a fundamental component of our criminal justice system." ***United States v. Cronic***, 466 U.S. 648, 653 (1984).  "This right of counsel's presence is required at every stage of a criminal proceeding where substantive rights of the accused may be affected." ***Commonwealth v. Johnson***, 828 A.2d 1009 (Pa. 2003).
>
> Here, there no evidence that [Petitioner] suffered a denial of representation at a critical stage of the proceedings when his attorney was absent during hearings regarding motions involving his co-conspirator.  The February 7, 2003 hearing on the motion to quash charges against Grimaldi had nothing to do with [Petitioner].  [Petitioner] is correct that Attorney Narcisi was not present during the testimony of Detective John Verrecchio at the March 6, 2003 hearing regarding the statement that Grimaldi gave to him.  However,

> Attorney Narcisi was present later that day and cross
> examined the detective about matters relating to [Petitioner].
>     [Petitioner] has failed to meet the requirements for
> PCRA relief based on ineffective assistance of counsel.
> [Citation omitted.]  He has not set forth the arguments his
> attorney should have made with respect to his co-defendant's
> motion to quash, or explained how he would have prevailed
> on those arguments if he had made them.  [Petitioner] has not
> specified the questions his counsel should have asked or
> arguments he should have made during the litigation of
> Grimaldi's motion to suppress the statement he gave to
> Detective Verrecchio.  Furthermore, he has not demonstrated
> how he was prejudiced by his counsel's failure to participate
> in pretrial proceedings dealing exclusively with his co-
> defendant.

Super. Ct.-PCRA at 7-8.  Therefore, the Superior Court concluded that the PCRA court

did not err in denying him relief.  Id. at 8.

The state court's determination is neither contrary to nor an unreasonable

application of Strickland.  The first proceeding, on February 7, 2003, concerned

Grimaldi's motion to quash some of the charges against him, and therefore the

proceeding did not involve Petitioner in any way.[13]  The second proceeding, on March 6,

2003, concerned Grimaldi's motion to suppress a statement he had given to police.

Petitioner's counsel was absent for approximately 45 minutes of the second proceeding,

but counsel returned before the presentation of any argument or evidence relating to

Petitioner.  Importantly, Petitioner had no right to object to the admission of Grimaldi's

statement, and when Petitioner's counsel attempted to interject his own questions and

arguments into Grimaldi's motion, Judge Sarmina ruled that he did not have standing to

---

[13]The February 7, 2003 transcript is not contained in the state court record,
presumably because it did not pertain to Petitioner.  Petitioner has not raised any basis to
doubt the Superior Court's statement that the hearing "had nothing to do with" Petitioner.

object.  N.T. 03/06/03 at 100 ("Mr. Grimaldi does have extremely able Counsel, so I'll let her speak for him and let you speak for [Petitioner.]").  Later, when Grimaldi's attorney had finished cross-examining a witness, Judge Sarmina asked Petitioner's counsel "[H]ow does this pertain to your client?" and did not allow counsel to ask the witness any questions.  Id. at 120-21.  In sum, both pretrial hearings concerned motions by co-defendant Grimaldi in which Petitioner's counsel had no role and did not have permission to ask questions or make any argument, and in any event Petitioner does not suggest what questions counsel should have attempted to ask or how he would have prevailed on any arguments that he should have attempted to make.  Thus, the record supports the state court's ruling that Petitioner did not suffer a denial of representation at a critical stage of the proceedings.

In his traverse, Petitioner asserts the general proposition that a defense motion to suppress is a "critical stage" of a criminal proceeding.  See Doc. 13 at 7 (citing cases).  However, cases so holding are those in which the petitioner's own motion to suppress is at issue, not that of a co-defendant.  See, e.g., Henderson v. Frank, 155 F.3d 159, 166 (3d Cir. 1998) ("A pretrial hearing considering the suppression of the defendant's confession is such a critical stage because its "results might settle the accused's fate and reduce the trial to a mere formality.'") (citation omitted).   Petitioner also makes several facially appealing arguments for how the hearings in question were "critical," noting for example that Petitioner's name appears in the caption of both hearings' Notes of Testimony, and that Judge Sarmina conducted a contempt hearing at the end of the March 6, 2003 proceeding because Petitioner's counsel failed to timely return following a lunch recess.

See Doc. 13 at 7 (citing N.T. 03/06/03 at 243-47).  However, Petitioner's name being on

the caption along with Grimaldi is consistent with the matter being joined for trial, and

Petitioner does not state that the proceedings concerned him or his case.  Similarly, the

record shows that Judge Sarmina conducted the contempt hearing not because counsel's

late arrival to the March 6, 2003 proceeding affected Petitioner in any way, but because

counsel "never communicated to this court that you had another matter in another

courtroom that you either wished to or needed to address," and that such failures to

communicate could cause unacceptable delays in the proceedings.  N.T. 03/06/03 at 244-

45.  For that reason, Judge Sarmina ruled that "any further failure to communicate which

leads to any kind of delay whatsoever . . . will cost [counsel] $15.00 per minute."  Id. at

246-47.  In short, Judge Sarmina's admonition of counsel concerned the efficient running

of the trial before her, and not deficient representation of, or prejudice to, Petitioner.

Even assuming counsel acted deficiently in not attending every moment of

Petitioner's co-defendant's pre-trial proceedings, Petitioner would fail to satisfy the

prejudice prong of Strickland.  See Smith v. Robbins, 528 U.S. 259, 284 (2000)

(prejudice prong turns on "whether there is a reasonable probability that, absent the

errors, the petitioner would have prevailed").  As the facts previously summarized make

abundantly clear – and as will be discussed in more detail in the context of Petitioner's

claim regarding the sufficiency of the evidence – ample evidence supported Petitioner's

convictions for involvement in various portions of the violent crime spree at issue.  In

addition, the record shows that Petitioner's counsel was present and fully engaged for the

entire trial and therefore had a full opportunity to contest all of the evidence presented,

15

and in fact did so.  Therefore, it cannot be said that counsel's alleged deficiency prejudiced Petitioner at trial.  Accordingly, I conclude that Petitioner is not entitled to relief on this claim of ineffectiveness of trial counsel.

### 2.  Ground Two: Trial counsel ineffectiveness for failing to file a severance motion

Petitioner also argues that trial counsel was ineffective for failing to file a motion to sever his trial from co-defendant Grimaldi, essentially arguing that the admission of Grimaldi's statements to the police impermissibly prejudiced Petitioner at trial in violation of Bruton v. United States, 391 U.S. 123 (1968), and its progeny.[14]  See Doc. 1 at 9 (Ground Two); Doc. 13 at 8-11.  Respondents counter that this claim is meritless. See Doc. 9 at 14-16.

In considering this claim on PCRA appeal, the Superior Court first set forth the standard for severing criminal trials under Pennsylvania law, noting that "[t]he decision to sever co-defendants' trials lies within the trial court's discretion, and will not be disturbed absent an abuse thereof."  Super. Ct.-PCRA at 8 (quoting Commonwealth v. King, 721 A.2d 763, 771 (Pa. 1998)).  Further, under Pennsylvania law, "[j]oint trials are favored when judicial economy will be served by avoiding the expensive and time-consuming duplication of evidence, and where the defendants are charged with

---

[14]In Bruton, the Supreme Court held that the Confrontation Clause was violated by the admission of a non-testifying codefendant's statement implicating the petitioner by name in the crime, despite an instruction that the jury not consider the statement against the defendant.  391 U.S. at 123-24, 137.

16

conspiracy." Id. (quoting Commonwealth v. Jones, 668 A.2d 491, 501 (Pa. 1995)).  The

Superior Court then stated:

> Grimaldi did not testify at trial.  Although Grimaldi's
> three confessions were read into the record by police
> witnesses, they were redacted, and [Petitioner's] name was
> replaced by pronouns.  [Petitioner] maintains that admission
> of the confessions at trial prejudiced him because they clearly
> implicated him in the charged crimes, and the confessions
> provided details about the crimes not otherwise admissible
> against him.  He also argues that the use of the confessions
> allowed the prosecutor, in his arguments, to attribute
> Grimaldi's violent behavior to [Petitioner].
>     The Pennsylvania Supreme Court "has specifically
> approved of redaction and a limiting instruction as a means of
> eliminating any possible prejudice arising from the admission
> of a co-defendant's confession at a joint trial."
> ***Commonwealth v. Travers***, 768 A.2d 845, 848 (Pa. 2001).
> Here, the court instructed the jury that any statements given
> by a defendant could only be considered as evidence against
> that defendant and could not be considered in any way against
> the other defendant.  N.T. Trial, 3/13/03, at 46-47.  "The jury
> is presumed to have followed the court's instructions."
> ***Commonwealth v. Freeman***, 827 A.2d 385, 409 (Pa. 2003).
>     "Separate trials of co-defendants should be granted
> only where the differences are irreconcilable and a joint trial
> would result in prejudice."  ***Commonwealth v. Williams***, 720
> A.2d 679, 685 (Pa. 1998) (citation omitted). . . .  [Petitioner]
> has not established why this matter is an exception to the
> general rule favoring joint trials.  Having failed to explain
> how he was prejudiced by counsel's decision not to file a
> motion to sever, he is not entitled to relief on this claim.

Pa. Super.-PCRA at 8-10.

The state court's determination is neither contrary to nor an unreasonable

application of Strickland.  Importantly, the rule for the admission of a co-defendant's

confession at a joint trial is the same under federal law as under Pennsylvania law,

specifically that the Confrontation Clause is not violated where the confession has been

redacted to remove the defendant's name and the jury is given a proper limiting instruction.  Compare Gray v. Maryland, 523 U.S. 185, 192 (1998) (concluding that a "redaction that replaces a defendant's name with an obvious indication of deletion, such as a blank space, the word 'deleted,' or a similar symbol," violates the Confrontation Clause) with Richardson v. Marsh, 481 U.S. 200, 211 (1987) (defining the contours of Bruton and holding that a codefendant's confession which had been redacted to eliminate all reference to the existence of the defendant did not violate the Confrontation Clause).

In his traverse, Petitioner argues that the pronoun substitution in Grimaldi's confessions was insufficient and prejudiced him because Petitioner was the only other defendant on trial.  See Doc. 13 at 10.  However, the alleged crimes concerned four co-conspirators involved in six separate robberies against eight victims over the course of four days – crimes closely linked in time, place and the individuals involved, and yet sufficiently distinct so that the jury would not be confused as to the discrete facts of each robbery.  These allegations supported the trial court's decision to jointly try any of the accused who had not pled guilty, because to do otherwise would have wasted judicial resources in covering the same factual ground and imposed a hardship on testifying witnesses and victims.  More importantly for purposes of admitting Grimaldi's statements at trial, the fact that multiple males were involved in the crime spree meant that the pronouns used in his statements read at trial could have referred to any of the conspirators

and not just to Petitioner.[15]   Moreover, Petitioner does not argue that the court's limiting

instruction regarding the use of the defendants' statements was deficient or that the jury

disregarded or failed to understand the instruction.

_____

[15]For example, the prosecutor read Grimaldi's first statement to the jury, in part, as follows:

> "Question:  Who came to the Plymouth Meeting Mall with you?"
> "Answer: Two other guys."
> "Question: What happened during the robbery?"
> "Answer:  We got out.  Went up to the ladies.  Another guy grabbed the lady and got the lady's purse.  The lady I tried to take the purse would not give it up so we fought, and then we took off."
> "Question: Who had the gun?"
> "Answer: I did."
> "Question: Did you hit her with the gun?"
> "Answer: Yes."
> "Question: Who drove the car?"
> "Answer: Not me."
> "Question: What was your role in the robbery?"
> "Answer: I did the robbery with another guy and a third guy drove."
> ….
> "Question: What did you do then?"
> "Answer: That's when we found the last guy somewhere.  We met at the Masonic Home and got in the stolen car."
> "Question: Where did you go?"
> "Answer: Started driving around.  I saw a lady that we were going up to and she ran.  Someone asked what time it was."
> ….
> "Question: Who drove the car?"
> "Answer: Not me."
> "Question: Who changed the license plates?"
> "Answer: Me and one of the other guys."

N.T. 03/12/03 at 157-59.  The remaining portions of Grimaldi's statements were similarly redacted.  See id. at 159-63, 188-92; N.T. 03/13/03 at 21-23, 62-63.  Given the neutral nature of the redactions and the existence of four co-conspirators in this case, the

19

In sum, Petitioner offers no convincing argument that his attorney should have filed a motion to sever this case, and there is no basis to believe that such a motion would have succeeded even if it had been filed. Therefore, I find that Petitioner is not entitled to relief.

### 3. Ground Three: Trial counsel ineffectiveness for failing to challenge the sufficiency of the evidence

Petitioner also argues that trial counsel was ineffective for failing to challenge sufficiency of the evidence regarding his convictions for the aggravated assault on Ms. DiGiacomo, and for failing to challenge three separate conspiracy convictions as to the attacks on Ms. Harmer, Ms. Wynne and Ms. Kwiecinski. See Doc. 1 at 11 (Ground Three); Doc. 13 at 11-17. Respondents counter that this claim is meritless. See Doc. 9 at 16-18.

Although evaluated under Strickland, both aspects of this claim – as to the aggravated assault conviction related to Ms. DiGiacomo, and the three conspiracy convictions related to Ms. Harmer, Ms. Wynne and Ms. Kwiecinski – implicate sufficiency of the evidence. In the context of sufficiency challenges, a court must determine "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

---

statements did not violate Bruton and its progeny. Compare Greene v. Palakovich, 606 F.3d 85, 106 (3d Cir. 2010) (no Bruton violation where neutral phrases and pronouns are used in place of redacted proper names or surnames, and where there were multiple co-conspirators) with Vazquez v. Wilson, 550 F.3d 270, 280-81 (3d Cir. 2008) (finding Bruton violation where statement read could refer to only two co-conspirators and therefore reference to "other guy" was not effective in concealing petitioner's identity). The fact that Grimaldi's statements could incriminate Petitioner by inference when linked with other evidence does not violate Bruton. See Richardson, 481 U.S. at 208-09.

beyond a reasonable doubt." <u>Sullivan v. Cuyler</u>, 723 F.2d 1077, 1083-84 (3d Cir. 1983)

(quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) (emphasis in original)).

Pennsylvania courts follow the same rule.  <u>See</u> <u>Commonwealth v. Trill</u>, 543 A.2d 1106,

1112 (Pa. Super. 1988) (verdict will be upheld if, "viewing the evidence in the light most

favorable to the Commonwealth, and drawing all reasonable inferences favorable to the

Commonwealth, there is sufficient evidence to find every element of the crime beyond a

reasonable doubt") (quoting <u>Commonwealth v. Griscavage</u>, 517 A.2d 1256, 1257 (Pa.

1986)).

On PCRA appeal, the Superior Court first considered this claim as it related to the

aggravated assault conviction related to Ms. DiGiacomo:

> [Petitioner] claims that during the February 14, 2002
> incident in the shopping mall parking lot, he robbed Delores
> Prince while Grimaldi robbed Dorothy DiGiacomo.  He
> asserts that he did not threaten, approach or assault
> DiGiacomo, although Grimaldi struggled with her and struck
> her on the head with a pellet gun while trying to get her purse.
> [Petitioner's] conviction was based on accomplice
> liability.  Even if a conspirator did not act as a principal in
> committing the underlying crime, he is still criminally liable
> for the actions of his co-conspirators taken in furtherance of
> the conspiracy.  [Petitioner] first gave a statement to
> detectives that he and two others had a conversation before
> the robberies of Prince and DiGiacomo, in which they said
> that they wanted to "rock."  [Petitioner] explained this meant
> "fighting, using your hands."  N.T. Trial, 3/12/03, at 141.
> This was circumstantial evidence that the co-defendants
> agreed to perform an illegal act.  The record further reveals
> that [Petitioner] and two others drove together to the
> Plymouth Meeting Mall where the robberies occurred.  He
> and Grimaldi approached Ms. Prince and Ms. DiGiacomo
> together.  While [Petitioner] pushed Ms. Prince against her
> car and demanded her handbag, Grimaldi kicked Ms.
> DiGiacomo and hit her in the head with a gun.  Grimaldi then

> followed [Petitioner] to a car in which they drove away.
> Accordingly, there was sufficient evidence to find [Petitioner]
> liable for the offenses committed by Grimaldi against Ms.
> DiGiacomo, including aggravated assault, because under the
> circumstances, the jury could have concluded that hitting Ms.
> DiGiacomo in the head with a gun constituted an attempt to
> cause serious bodily injury.

Super. Ct.-PCRA at 11-12 (citations to state law and PCRA filing omitted).

Pennsylvania law provides in relevant part that a person is guilty of aggravated assault if he "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life."  18 Pa. C.S.A. § 2702(a)(1).  Where a victim does not sustain serious bodily injury, the prosecution must prove by direct or circumstantial evidence that the defendant acted with specific intent to cause such injury. Commonwealth v. Holley, 945 A.2d 241, 247 (Pa. Super. 2008).  Here, Petitioner explicitly "does not take issue with" his robbery and conspiracy convictions related to the mall parking lot assault on Ms. Prince and Ms. DiGiacomo.  Doc. 13 at 12.  Instead, Petitioner argues that the evidence was insufficient regarding Grimaldi's intent to inflict serious bodily injury on Ms. DiGiacomo, noting that she suffered only "minor abrasions and swelling" and did not require any medical treatment, and that Grimaldi "broke off the attack and fled" along with Petitioner rather than inflict further injuries on Ms. DiGiacomo.  Id. at 12-13.  The fact that Ms. DiGiacomo did not suffer serious injuries is fortunate, but her fortune does not render insufficient the evidence of Grimaldi's intent to inflict serious bodily injury.  As part of his aggressive assault on Ms. DiGiacomo,

Grimaldi kicked her and hit her on the head with a gun.  As the Superior Court found, a

jury could find that these actions constituted an attempt to cause seriously bodily injury.

As for the three conspiracy convictions related to Ms. Harmer, Ms. Wynne and

Ms. Kwiecinski, the Superior Court stated:

> In a related claim, [Petitioner] asserts that counsel was
> ineffective for failing to assert . . . that there was insufficient
> evidence to support his convictions for three separate
> conspiracies arising from offenses that occurred during the
> night of February 14, 2002 and the early morning hours of
> February 15, 2002.
>
> During a period of approximately two hours,
> [Petitioner] and his co-conspirators stole Ms. Harmer's car,
> attempted to rob Ms. Wynne, and attacked Ms. Kwiecinski.
> [Petitioner] argues that the evidence does not show that they
> planned to commit specific crimes; rather, they committed
> crimes of opportunity in furtherance of their general
> agreement to get money.  In support of his contention that the
> three criminal acts were part of one conspiracy, he relies on
> section 903(c) of the Crimes Code, which provides, "[i]f a
> person conspires to commit a number of crimes, he is guilty
> of only one conspiracy so long as such multiple crimes are the
> object of the same agreement or continuous conspiratorial
> relationship."  18 Pa.C.S. § 903(c).
>
> . . . .  We agree with the trial court that the record
> contains adequate support for the jury's finding of three
> separate conspiracies.  The robberies and assaults involved
> three separate victims in different locations.  The crimes were
> not interdependent  . . . .

Super. Ct.-PCRA at 12-13 (citations to state law and PCRA filing omitted).

Under Pennsylvania law, several factors are considered to determine whether a

single or multiple conspiracies have been established, including (1) the number of overt

acts in common, (2) the time period during which the acts took place, (3) the similarity of

the acts, (4) the locations in which the alleged acts occurred, (5) the extent to which the

purported conspiracies share a common objective, and (6) the degree to which interdependence is needed for the overall operation to succeed.  Commonwealth v. Savage, 566 A.2d 272, 278 (Pa. Super. 1989).  The crimes are not considered to be interdependent where one offense is a "necessary intermediate step" to the commission of a later offense.  Commonwealth v. Andrews, 768 A.2d 309, 316-17 (Pa. 2001).  In Andrews, for example, the Pennsylvania Supreme Court affirmed the finding of two separate conspiracies where co-defendants committed two robberies on separate victims in different parts of the same city separated by three hours.  Id.  Such state law rulings do not conflict with any relevant federal precedents.

Here, Petitioner argues that although the overall crime spree spanned four days, the robberies of Ms. Harmer, Ms. Wynne and Ms. Kwiecinski, which gave rise to three conspiracy convictions, occurred over a period of one hour and fifty minutes in the same city, and therefore properly constituted a single conspiracy.  See Doc. 13 at 14-15.  As the Superior Court explained in applying Pennsylvania law, the jury permissibly found each of the three robberies to be discrete conspiracies insofar as the crimes were not "interdependent."   That is, the robberies involved three separate victims in three different locations of the city, each separated by some passage of time, and each involving somewhat different methods.  Specifically, at approximately 10:15 p.m. on February 14, 2002, the perpetrators pointed a gun at Ms. Harmer, demanded money from her, and stole her car; at approximately 11:50 p.m. they stalked Ms. Wynne but did not assault her; and at approximately 12:05 a.m. on February 15, 2002, they violently attacked Ms.

Kwiecinski, stabbing her multiple times and causing serious injuries.  Pa. Super.-PCRA at 3-4.

In sum, the evidence meets the <u>Jackson</u> standard regarding Petitioner's conviction for the aggravated assault on Ms. DiGiacomo, as well as his three conspiracy convictions related to the robberies of Ms. Harmer, Ms. Wynne and Ms. Kwiecinski.  Because counsel cannot be deemed ineffective for failing to raise meritless claims, I find that Petitioner is not entitled to relief.

### 4. Ground Four: Trial counsel ineffectiveness for failing to challenge "impermissible factors" in sentencing

Petitioner also argues that trial counsel was ineffective for failing to challenge "impermissible factors" in sentencing.  <u>See</u> Doc. 1 at 12 (Ground Four).  Respondents counter that this claim is meritless.  <u>See</u> Doc. 9 at 18-19.

In considering this claim on PCRA appeal, the Superior Court stated:

> [Petitioner] next asserts that his trial counsel rendered ineffective assistance by failing to challenge the court's reliance on impermissible considerations when imposing sentence upon him.
> On May 29, 2003, the court held a joint sentencing hearing for [Petitioner] and Grimaldi.  At the conclusion of testimony and argument, the court stated:
>
>> Well, the Court has considered all of the materials that have been submitted, and the Court is also quite aware of the facts, having presided over the lengthy trial that took place here as a jury trial.  And the sentences of the Court do, in fact, reflect that the consequences on the lives of eight innocent people who were going about their day-to-day affairs will, in fact, last a lifetime.

25

> And the attacks, the Court views them with
> having been replete with needless violence
> which did rise to a sadistic level in a couple of
> occasions, and fortunately, not so sadistic in the
> incident involving Jacqueline Harmer.

N.T. Sentencing Hearing, 5/23/03, at 96-97.  The court
sentenced [Petitioner] to forty-four and one-half to ninety-
four years' imprisonment, and Grimaldi to forty-three to one
hundred and three years' imprisonment.

[Petitioner] first notes that he was not found guilty of
the attack on Mr. Rosenberger.  Nevertheless, relying on the
similarity of the sentences imposed on himself and Grimaldi,
he asserts that "it reasonably appears from the record that the
court, in the sentencing of [Petitioner], considered the
Rosenberger assault."  We disagree.

The record reflects that the court sentenced [Petitioner]
for his involvement in crimes against seven victims.
[Petitioner] offers only speculation in support of his claim
that the court considered the assault against Mr. Rosenberger,
and accordingly trial counsel did not err in failing to object on
this basis.

In a related, and equally unpersuasive argument,
[Petitioner] claims that trial counsel was ineffective for
failing to object to the court's statement that the offenses
were sadistic. . . .  In light of the factual history set forth
above, there is simply no arguable merit to [Petitioner's]
claim that counsel should have objected to the application of
the adjective "sadistic" to the crimes in which he was
involved.

Super. Ct.-PCRA at 14-15 (footnote and citations to PCRA Brief omitted).  Similarly, the

Superior Court rejected Petitioner's argument that trial counsel was ineffective for failing

to object to victim impact statements of relatives of the victims at the sentencing hearing.

Id. at 16-17.

The state court's determination is neither contrary to nor an unreasonable

application of Strickland.  As an initial matter, Petitioner does not identify in his habeas

26

petition what factors he believes the trial court erroneously considered, on what basis his trial counsel should have objected, or how he was prejudiced, and this is the only claim Petitioner did not address in his traverse.  See Doc. 13.[16]  As Respondents reasonably point out, see Doc. 9 at 19, the gist of Petitioner's argument to the state courts was that he considered his total sentence to be unfair because it was nearly as long as his co-defendant Grimaldi, even though Grimaldi was the more violent offender.  However, Petitioner's original sentence was as to seven victims, and thus Mr. Rosenberger was clearly not included.  The fact that the sentences were similar does not alone indicate a defect in Petitioner's sentence, and Petitioner also does not take into account the later reductions in his sentence.  More importantly, despite characterizing some of the crimes as "sadistic," the trial court did not sentence Petitioner outside the Sentencing Guidelines for any of the offenses.  See Super. Ct.-PCRA at 15 n.5.

As a result, there are no federal concerns implicated in what is essentially an underlying state law sentencing claim, and no basis to find that counsel was ineffective in failing to challenge any "impermissible factors" in sentencing.  Accordingly, Petitioner is not entitled to relief as to this claim.

---

[16]In his traverse, Petitioner attaches as "Exhibit B" a document which begins with the caption "Defense Counsel Rendered Ineffective Assistance in Failing to Argue, On Appeal, that the Court Imposed a Manifestly Excessive Sentence."  Doc. 13 at 26-27.  It is unclear whether this constitutes briefing in support of Ground Five, as the other grounds for relief are addressed in the body of the traverse and not by way of "exhibit."  In any event, Petitioner argues in "Exhibit B" that in rendering a sentence which is "tantamount to a life sentence," the sentencing court "focused unduly on the crimes, and excluded consideration of defendant's youth and possibility of rehabilitation."  Id. at 26.  These arguments are premised entirely on state law and are therefore non-cognizable on federal habeas appeal, and in any event they were never presented to the state courts and are therefore unexhausted and procedurally defaulted.

### 5.  Ground Five: Ineffectiveness of prior counsel for failing to object to the imposition of a mandatory minimum sentence.

Petitioner also argues that prior counsel was ineffective for failing to object to the court's imposition of a mandatory minimum sentence.  See Doc. 1 at 4 (Ground Five); Doc. 13 at 18-23.  Respondents argue that the claim is non-cognizable because the underlying issue is premised exclusively upon state sentencing law, and in any event is moot because Petitioner has already been re-sentenced related to the mandatory minimum sentence imposed on him as an unarmed co-conspirator in the robberies of Ms. Prince and Ms. DiGiacomo.  See Doc. 9 at 20.

I agree with Respondents that the claim is moot.  On PCRA appeal, Petitioner argued that counsel was ineffective for failing to argue in his prior appeal that the mandatory minimum sentence imposed on him as an unarmed co-conspirator in the robberies of Ms. Prince and Ms. DiGiacomo was illegal.  See Super. Ct.-PCRA at 17-18. As previously noted, the Superior Court agreed and remanded for resentencing pursuant to Dickson – decided while Petitioner's case was on appeal – in which the Pennsylvania Supreme ruled that a mandatory enhancement does not apply to an unarmed co-conspirator.  Id. at 19.  As the underlying error has already been addressed and Petitioner re-sentenced, he is not entitled to further relief on this claim.[17]

---

[17]In his traverse, Petitioner raises a new argument that was not presented to the state courts or in his federal petition.  He argues that his present claim goes far beyond the improper mandatory minimum sentence he received as an unarmed co-conspirator in the robberies of Ms. Prince and Ms. DiGiacomo, which was remedied on collateral appeal, in that "he has approximately 8 to 10 mandatory minimum sentences that were never submitted to a jury" as required by the June 17, 2013 United States Supreme Court decision in Alleyne v. United States, __ U.S. __, 133 S. Ct. 2151 (2013).  Doc. 13 at 18-

**B.**     **Ground Six: Due Process Violation Related to Consolidation of Charges**

In Ground Six, Petitioner argues that the trial court violated his due process rights by consolidating the charges against him at trial, confusing the jury because "the offenses charged were not based on the same act or transaction."   See Doc. 1 at 5 (Ground Six).[18]

---

23.  In Alleyne, the Supreme Court held that "'any facts that increase the prescribed range of penalties to which a criminal defendant is exposed' are elements of the crime and must be found beyond a reasonable doubt." 133 S. Ct. at 2160 (quoting Apprendi v. New Jersey, 530 U.S. 466, 490 (2000)).  Petitioner argues that Alleyne established a new constitutional right and that it should be applied to the other mandatory minimum sentences he received, see Doc. 13 at 20, and in support thereof submits a May 14, 2014 Opinion and Order from the Court of Common Pleas of Blair County, Pennsylvania, addressing the impact of the Alleyne on certain state criminal statutes.  See Doc. 14 (Commonwealth v. Weyant, CR 1029 & 1032-2013 (Blair C.C.P. May 14, 2014)). Petitioner is incorrect.  As previously explained, the Superior Court granted in part Petitioner's collateral appeal on December 21, 2012, and Petitioner was re-sentenced as to one conviction in March 2013.  Petitioner did not file an appeal from his re-sentencing, and therefore it became final in April 2013.  Therefore, the Supreme Court's June 2013 decision in Alleyne occurred after the conclusion of Petitioner's original direct appeal and his collateral appeal, and also after the conclusion of the time in which Petitioner could have timely appealed his re-sentencing.  When the Supreme Court announces a new rule of law, it generally applies only to cases still on direct appeal, and "will only apply 'in limited circumstances' to cases in which the conviction is already finalized." United States v. Reyes, 755 F.3d 210, 212 (3d Cir. 2014) (quoting Schriro v. Summerlin, 542 U.S. 348, 351-52 (2004)).  In Reyes, the Third Circuit recently held that although Alleyne sets out a new rule of law, it is not retroactively applicable to cases in which the conviction, as here, is already final.  Id. at 212-13.  Similarly, the panel of state court judges in Weyant was concerned with whether and to what extent Alleyne affected cases that had not yet gone to trial; it did not address cases in which there were final convictions.  See Doc. 14 at 13 (ECF pagination).  Accordingly, Alleyne affords Petitioner no further avenue of relief.

    [18]In other words, Petitioner's due process claim is premised on trial court error for consolidating all of the charges against him for purposes of a single trial, and not the court's decision to try him together with Grimaldi.  See Doc. 1 at 5.

The District Attorney argues that the claim is unexhausted and defaulted, and in the alternative, meritless.  See Doc. 9 at 20-21.

Petitioner avers that he exhausted this claim on direct appeal.  See Doc. 1 at 5.  As previously noted, Petitioner raised only one claim on direct appeal, namely, that the trial court erred by granting the Commonwealth's motion to consolidate all of the charges against him because such consolidation confused the jury.  See Super. Ct-Direct at 7. While it is true that Petitioner did not explicitly refer to due process, Petitioner's claim that the trial court confused the jury by consolidating the charges against him clearly constituted a challenge to the fundamental fairness of his trial.  I therefore conclude that Petitioner adequately placed the state courts on notice that his consolidation claim implicated due process.  See Duncan v. Henry, 513 U.S. 364, 365 (1995) ("it is not necessary to invoke the talismanic phrase due process of law or cite book and verse on the federal constitution" to fairly present a due process claim).  As a result, I will reach the merits of the claim and employ the de novo standard of review.[19]

Respondents argue in the alternative that the claim is without merit because "the state courts reasonably concluded that the trial court did not abuse its discretion in granting the Commonwealth's motion to consolidate the charges," and because the fact

---

[19]Because the state courts did not reach the merits of Petitioner's due process claim, the AEDPA's deferential standard of review does not apply.  Appel v. Horn, 250 F.3d 203, 210 (3d Cir, 2001) ("[W]hen, although properly preserved by the defendant, the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standard provided by AEDPA . . . do not apply.").  Therefore, this claim is reviewed using the de novo standard of review.  See Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005) ("In cases where the AEDPA standards of review do not apply, federal habeas courts apply pre-AEDPA standards of review.").

record and state law supported the conclusion.  Doc. 9 at 21.  As an initial matter, the issue for this court is not whether the consolidation of charges in this case was proper under state law, because federal habeas relief "does not lie for errors of state law." Estelle v. McGuire, 502 U.S. 62, 67 (1991).  Rather, the only issue to resolve is whether the trial court's action in granting the Commonwealth's motion to consolidate so undermined the fundamental fairness of the trial that it failed to comport with constitutional due process standards.  See United States v. Valenzuela-Bernal, 458 U.S. 858, 872 (1982) ("Due process guarantees that a criminal defendant will be treated with 'that fundamental fairness essential to the very concept of justice.  In order to declare a denial of it [a court] must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.'") (quoting Lisenba v. California, 314 U.S. 219, 236 (1941)).

In the context of a motion to consolidate, the Supreme Court has recognized that joint trials – whether of several co-defendants or of one defendant charged with multiple offenses – are permissible, even though they may "furnish inherent opportunities for unfairness when evidence submitted as to one crime . . . may influence the jury as to a totally different charge."  Spencer v. Texas, 385 U.S. 554, 562 (1967).  In Spencer, the Supreme Court reasoned that "[t]his type of prejudicial effect . . . is justified on the grounds that (1) the jury is expected to follow instructions in limiting this evidence to its proper function, and (2) the convenience of [the joint trial] . . . is a valid government interest."  Id.  Even improper consolidation, by itself, does not violate the Constitution.  Rather, consolidation rises to the level of a constitutional violation "only if it results in

31

prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."
United States v. Lane, 474 U.S. 438, 446 n.8 (1986).  "[A]n error involving misjoinder
. . . requires reversal only if the misjoinder results in actual prejudice because it 'had
actual and injurious effect or influence in determining the jury's verdict.'"  United States
v. Jimenez, 513 F.3d 62, 83 (3d Cir. 2008) (quoting Lane, 474 U.S. at 449); see also
Herring v. Meachum, 11 F.3d 374, 377 (2d Cir. 1993)  ("[W]here a defendant is claiming
a due process violation based upon joinder of offenses, he must, to succeed, go beyond
the potential for prejudice and prove that *actual* prejudice resulted from the events as they
unfolded during the joint trial.") (emphasis in original).

In discussing the merits of Petitioner's consolidation claim on direct appeal under
relevant state rules and caselaw, the Superior Court stated the following:

> This Court reviews the grant of a motion to consolidate
> charges filed by the Commonwealth for an abuse of
> discretion.  The relevant standard governing the consolidation
> of offenses requires the court to determine
>
> > whether the evidence of each of the offenses
> > would be admissible in a separate trial for the
> > other; whether such evidence is capable of
> > separation by the jury so as to avoid danger of
> > confusion; and, if the answers to these inquiries
> > are in the affirmative, whether the defendant
> > will be unduly prejudiced by the consolidation
> > of offenses.
>
> [Petitioner], in challenging the trial court's decision to
> consolidate, bears the burden of proving (1) that he was
> prejudiced by the decision not to sever, and (2) that he was
> **unduly prejudiced**, namely, that the "evidence tended to
> convict appellant only by showing his propensity to commit
> crimes[.]"

 Super. Op.-Direct at 7-8 (footnotes and citations omitted).  The Superior Court went on to summarize the testimony of each of the victims of the crime spree, and concluded that "the record belies [Petitioner's] claims of confusion or undue prejudice, since the evidence of the criminal occasions, each of which involved different victims, different geographic locations, different times, and different means of linking [Petitioner] to the crimes alleged, was easily separable by a jury and the potential for confusion or undue prejudice was negligible."  Id. at 10.  Therefore, the Superior Court denied Petitioner's claim.  Id. at 11.

The decision of the state court comports with due process.  At trial, ample evidence linked Petitioner to each discrete attack in the crime spree.  For example, although neither Ms. Folger nor Ms. Talese identified Petitioner as one of the four males who attacked them, both testified that one of the attackers was holding an aluminum baseball bat with black stripes at the base – and Ms. Folger identified, as the same weapon, an aluminum baseball bat which the police recovered outside Petitioner's residence.  N.T. 03/08/03 at 127, 133-35, 141 (Folger); 158-60 (Talese).  The Commonwealth presented testimony that Petitioner made a statement to the police in which he admitted his involvement in the robberies of Ms. Prince and Mr. DiGiacomo at the Plymouth Meeting Mall.  N.T. 03/12/03 at 138-41.  Ms. Harmer, who had been attacked in a different location about thirty-five minutes after Ms. Folger and Ms. Talese, identified two of her three male assailants as Grimaldi and Petitioner, testified that the attackers fled in her car, a black 2000 Dodge Straus, and that she identified Petitioner and Grimaldi at the scene where they crashed her car.  N.T. 03/08/03 at 243, 245-46, 251.

Ms. Wynne testified that she was accosted in Manayunk by three males who exited from a black Dodge Stratus whose license plate she obtained, and she identified two of the men as Grimaldi and Petitioner at the scene of the car's subsequent crash and again at trial. N.T. 03/11/03 at 38-39, 41, 47-48.  Lastly, Ms. Kwiecinski testified that she was assaulted by several white males after a black car had passed her and honked at her.  N.T. 03/11/03 at 137-28.  In his statement to the police, Petitioner intimated that he had knowledge of the attack upon Ms. Kwiecinski, although he denied participating in the attack.  N.T. 03/12/03 at 141-42.[20]

In sum, although Petitioner was charged with multiple offenses flowing from one crime spree, each attack in the crime spree occurred in a difference place and time and involved different victims and different methods.   In addition to the discrete evidence supporting Petitioner's convictions on the individual charges, Petitioner has not pointed to any record evidence, nor is any apparent, showing any jury confusion whatsoever, let alone jury confusion "so great as to deny a defendant his Fifth Amendment right to a fair trial."  Lane, 474 U.S. at 446 n.8.  There being no evidence of undue prejudice regarding the consolidation of charges against Petitioner, I conclude that Petitioner is not entitled to relief on his due process claim.

---

[20]In his traverse, Petitioner concedes that he confessed to his participation in the incident involving Ms. Prince and Ms. DiGiacomo in the Plymouth Meeting Mall parking lot, the robbery of Ms. Harmer's car, and to being present during the assault and robbery of Ms. Kwiecinski.  See Doc. 13 at 2.

IV.    <u>CONCLUSION</u>

Petitioner's habeas petition asserts six grounds for relief and is timely.  Grounds One through Five (ineffective assistance of counsel) are exhausted but meritless under deferential AEDPA review.  Ground Six (due process) is found to be exhausted, but is meritless under de novo review.  Therefore, Petitioner is not entitled to habeas relief. [21]

Accordingly, I make the following:

<b>R E C O M M E N D A T I O N</b>

AND NOW, this   22nd    day of December 2014, IT IS RESPECTFULLY RECOMMENDED that the petition for writ of habeas corpus be DENIED. There has been <u>no</u> substantial showing of the denial of a constitutional right.  The parties may file objections to this Report and Recommendation.  <u>See</u> Local Civ. Rule 72.1.  Failure to file timely objections may constitute a waiver of any appellate rights.

/s/ELIZABETH T. HEY

_____

ELIZABETH T. HEY, U.S.M.J.

---

[21]I further find that a Certificate of Appealability ("COA") is unwarranted. Pursuant to Local Appellate Rule 22.2 of the Rules of the United States Court of Appeals for the Third Circuit, at the time a final order denying a habeas petition is issued, the district judge is required to make a determination as to whether a COA should issue. Where the petition is untimely or otherwise procedurally defective, a COA is not warranted unless the petitioner demonstrates that reasonable jurists would: (1) "find it debatable whether the petition states a valid claim of the denial of a constitutional right;" and (2) "whether the district court was correct in its procedural ruling."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).   Because I find that there is no valid claim of a denial of a constitutional right, Petitioner is not entitled to a COA.  <u>Id</u>.